STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  Docket No. AP-15-20


CITY OF PORTLAND,               STATE OF MAINE
                                Cumberland ss. Clerk's Office
          Plaintiff            AUG 03 2016

v.                             RECEIVED                    ORDER


MAINE DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.,

          Defendants


Before the court is the City of Portland's 80C appeal from a decision by defendant Maine

Department of Health and Human Services (DHHS) to withhold a total of $1,297,120.50 in

General Assistance reimbursement from the City for the period covering mid-June 2014 through

February 2015. Counsel appeared at a hearing on August 1, 2016 because the court had some

questions with respect to the record and the relief that the City was requesting.


Prior Proceedings

On June 11, 2015 the City filed a Rule 80C petition for review of the DHHS action,

combined with a claim for declaratory and injunctive relief and an independent claim seeking

relief on a theory of promissory estoppel. DHHS moved to dismiss the claim for declaratory and

injunctive claim and the promissory estoppel claim, alleging that those claims were duplicative

of relief available under Rule 80C.

Initially the Rule 80C appeal was complicated by a dispute between the parties as to

whether DHHS was required to provide the City with an administrative hearing before a fair

hearing officer under 22 M.R.S. § 4323(4). The City initially had sought a stay of the DHHS action pending such a hearing.

At a scheduling conference on July 21, 2015 the parties agreed that the court could proceed to hear the Rule 80C appeal. While continuing to pursue its argument that it is entitled to an administrative hearing, the City withdrew its request for a stay. DHHS agreed to waive any argument that the City had not exhausted its administrative remedies. The parties also agreed to file the record and their Rule 80C briefs while the motion to dismiss remained pending. *See* order dated July 22, 2015.

After the briefs were filed, the parties informed the court that there were other pending administrative proceedings that might affect the case. By agreement of the parties, the court stayed any decision until March 31, 2016. After that time it was understood that the court would proceed to decide the appeal. *See* order dated February 12, 2016.

General Assistance Program

General Assistance is governed by Chapter 1161 of Title 22. It is designed to offer immediate aid to persons who are unable to provide basic necessities such as food, clothing, shelter, and medical care essential to maintain themselves and their families. *See* 22 M.R.S. §§ 4301(1), (3), (5), (10). Each municipality is required to operate a general assistance program which shall be administered in accordance with a municipal ordinance. 22 M.R.S. § 4305(1). The governing statute requires that eligibility must be based on need. *E.g.,* 22 M.R.S. § 4308(1). With

2

minor exceptions,[1] the responsibility for setting all other eligibility standards is placed on municipalities. 22 M.R.S. § 4305(3):

> Municipalities may establish standards of eligibility, in addition to need, as provided in this chapter. Each ordinance shall establish standards which shall:
> (A) Govern the determination of eligibility of persons applying for relief . . . .

Each municipal ordinance must also provide that relief shall be furnished or denied to all eligible applicants within 24 hours of their application. 22 M.R.S. § 4305(3)(C).

Although General Assistance payments are made by municipalities, the statute provides that municipalities shall receive reimbursement by DHHS for a substantial portion of those payments. For the time periods at issue on this appeal, the statute provided that DHHS shall reimburse a municipality for 50% of its direct General Assistance costs up to .0003 of the municipality's most recent state valuation and for 90% of direct General Assistance costs in excess of .0003 of the most recent state valuation when the Department finds that the municipality has been "in compliance with all requirements of this chapter." 22 M.R.S. §§ 4311(1), (1-B).[2]

22 M.R.S. § 4323(1) provides that DHHS shall review the administration of general assistance in each municipality. If DHHS finds "any violation of this chapter after review," it shall notify the municipality that it has 30 days to file a plan to correct the violation. 22 M.R.S. § 4323(2). Any municipality which fails to file an acceptable plan or which remains "in violation

---

[1] For example, section 4301(3) provides that fugitives from justice are not eligible for general assistance, and the Commissioner of DHHS is authorized to establish standards of eligibility for general assistance in the unorganized territories. 22 M.R.S. § 4312.

[2] Effective June 30, 2015, the Legislature amended the reimbursement formula in 22 M.R.S. § 4311 to provide that after July 1, 2015 DHHS will reimburse 70% or all direct costs incurred by a municipality in its general assistance program. Laws 2015, c. 267 § SSSS-1. For the time period at issue on this appeal the prior formula has been retained in the statute.

3

of this chapter" 60 days after filing its plan is subject to civil penalties and DHHS shall in addition "withhold reimbursement to any municipality which is in violation of this chapter" until it achieves compliance. *Id.*

Regulations governing DHHS review, the imposition of penalties, and DHHS reimbursement are contained in the DHHS General Assistance Policy Manual at 10-144 C.M.R. ch. 323, sections X, XII, and XIII respectively.

Record Evidence

The dispute in this case involves the City's right to reimbursement under the General Assistance Program for individuals at the City's Homeless Shelter.

The record reflects that there were discussions between DHHS and the City since at least 1996 in which the City took the position based on 22 M.R.S § 4304(3) that homeless persons staying at the City's homeless shelter were presumed to be eligible for General Assistance. The City sought reimbursement accordingly. Although DHHS expressed disagreement with that position on at least one occasion, R. Tab 1, DHHS acknowledges that it did not take any action to withhold reimbursement or to demand that the City change its approach from at least 1996 until early 2014. Brief of Respondents at 2. *See* R. Tab 2-7 (letters from DHHS stating that Portland is in compliance with the General Assistance Statute and DHHS policy from March 2008 through May 2013). From 1996 onward DHHS expressly agreed that the costs of running the shelter, including rent, electricity, heat, and personnel costs, would be treated as General Assistance operating costs rather than as administrative costs. R. Tab 1.[3] Finally, from 1996 onward DHHS allowed Portland to use an abbreviated eligibility form for shelter residents. *Id.*

---

[3] Under the statute DHHS only reimburses a municipality for its "net general assistance costs," which are defined as the direct costs incurred by the municipality in providing assistance to eligible persons, not

4

The record indicates that the first time these understandings changed was when DHHS issued preliminary audit findings relating to the month of June 2013. The preliminary audit findings are contained in the record as part of R. Tab 8, along with a response from the City.

In the audit the examiner reviewed 90 specific cases and found that each met the standards in the DHHS policy manual, 10-144 C.M.R. ch. 323, section X. However, the preliminary audit findings identified what the DHHS Field Examiner termed four "improper eligibility and reimbursement practices" with respect to the Oxford Street Shelter. First, the examiner stated Portland was not obtaining interim reimbursement assistance forms from persons staying at the shelter.[4] The City's response disputed that such forms were not being collected. R. Tab 8 at 2.

Secondly, the examiner stated that eligibility was not being determined on at least a monthly basis as required by 22 M.R.S. § 4309 and that the City was not using the appropriate shelter eligibility form. The City responded that the procedures it had been using were procedures that had previously been approved by DHHS. R. Tab 8 at 3.

Third, the examiner stated stated that presumptive eligibility under 22 M.R.S. § 4304(3) should only apply for one night and that after one night eligibility should be individually determined.

Finally, the examiner stated that the City was improperly seeking reimbursement based on the operating costs of running the shelters.

---

including administrative costs. 22 M.R.S. § 4301(11). In agreeing that the costs of running the shelter were not administrative costs, DHHS was agreeing to reimburse the City for those costs at the rate specified in the statute.

[4] Interim reimbursement forms are designed to obtain federal repayment of amounts paid for General Assistance to persons receiving Supplemental Security Income (SSI). *See* 22 M.R.S. § 4318.

On both of the latter issues, the City responded that it disagreed that the statute allowed presumptive eligibility for only one night and stated that DHHS had audited its program in prior years and had previously found the City's presumptive eligibility practices to be in compliance with chapter 1161. R. Tab 8 at 3-5. The City also pointed out that DHHS had expressly approved reimbursement for the operating cost of running the shelters. R. Tab 8 at 4, citing R. Tab 1.

DHHS drafted a letter to the City that is contained in the record as R. Tab 9. The draft, dated April 24, 2014, stated that DHHS had found the City out of compliance with respect to the second, third, and fourth issues raised by the field examiner and set forth steps that were necessary to bring the City back into compliance. The letter noted that 22 M.R.S. § 4323 required the City to submit a plan of correction and that if it failed to do so, § 4323 would allow the Department "to withhold reimbursement until the plan is received." The draft letter also advised the City that if it disagreed, it could seek a fair hearing under § 4323.

DHHS acknowledges, however, that the draft letter was never sent and that DHHS did not resort to its remedies under § 4323 or otherwise seek to withhold reimbursement at that time. Respondent's Brief at 2-3.

In January 2015 DHHS conducted another audit of Portland's General Assistance program. Although the record reflects that the preliminary audit findings were transmitted to the City on or about February 20, 2015, *see* R. Tab 11 at 1, the preliminary audit findings are not contained in the record. However, counsel for the parties confirmed at the August 1, 2016 hearing that the preliminary audit findings tracked the final audit findings, which are dated March 24, 2015 and are found in the record at R. Tab 12.

In the final audit findings DHHS stated that it found that the City was in violation of General Assistance statutory and regulatory requirements in five respects in connection with the

City's Oxford Street Shelter and Family Shelter: (1) eligibility was not being determined on at least a monthly basis; (2) presumptive eligibility was being applied for more than an initial night at the shelter; (3) the City was not entitled to reimbursement for the operating costs of the shelter; (4) the City was not requiring shelter residents to utilize their existing income or resources as required by 22 M.R.S. § 4317; and (5) the City was improperly submitting reimbursement for non-citizens in violation of federal law. R. Tab 12 at 6-11.

Items (1) through (3) essentially reiterated the points made – but not followed up – during the prior year's audit. Item (4) was new and was based on the Department's finding that some of the individuals staying at the shelter were ineligible because they had assets in savings or checking accounts. The audit stated that of the 30 residents who had stayed the most nights, at least 13 had more than $20,000 in savings or checking accounts. According to the audit, one of those was reported to have had $92,424 in his accounts and another had been reported as having as much as $ 161,351 in liquid assets. The audit also noted that some City employees serve as representative payees for individuals receiving SSI[5] and that at least 60 of those individuals stayed at least one night at the Oxford Street Shelter in 2014. According to the audit, many of those had bank account balances amounting to as much as $50,000 as of January 2015. R. Tab 12 at 10-11.

Item (4) of the audit findings is based on documents bearing the indication that they were faxed on January 22, 2015 from the ASPIRE program. The faxed documents are included in the record at R. Tab 30. Certain of those documents contain typewritten lists of certain residents at the Oxford Street Shelter with handwritten notations of account balances belonging (or allegedly belonging) to those residents. The March 24, 2015 final audit references some of those balances

---

[5] Representative payees are persons appointed to manage funds of recipients who are unable to do so for themselves. *See* 20 C.F.R. § 416.601(b)(1).

7

at R. Tab 12 at 10-11. As discussed below, however, the record does not establish the source of the handwritten account balances even if it is assumed that the typewritten lists originated with the City.

The reference in item (4) to the 30 residents who had stayed the most nights is based on a list dated November 19, 2013 found at the fifth page of R. Tab 30.[6] Dollar amounts have been penciled in next to 13 of the individuals. Of the 13 individuals for whom dollar amounts are listed, three show amounts in excess of $50,000;[7] the remaining 10 individuals show amounts from $ 19,368 to $ 48,696. There is nothing on the November 19, 2013 document indicating whether any of the individuals listed stayed at the shelter during the period from mid-June 2014 through February 2015 – the period for which reimbursement has been denied.

The reference in item (4) of the audit findings to representative payees who stayed at least one night at the shelter during 2014 is based on a list which consists of the last two pages in R. Tab 30. That list shows 59 representative payees who stayed at the shelter in 2014. It does not show how many specifically stayed there between June 13, 2014 and December 31, 2014. Next to those individuals is a handwritten list of the amounts in their checking and savings account balances as of January 16, 2015. One of those individuals shows a balance of $ 50,491.76 and one shows a balance of $ 43,801.49. The individual with the next highest balance is $ 12,303.82. Ten individuals have balances of zero or less than $100, and 45 of the individuals have balances of less than $ 2,000. Adding the January 16, 2015 account balances for all 59 listed individuals comes to $197,629.16.

---

[6] In all of the documents listing individuals in R. Tab 30, surnames have been redacted.

[7] One of those three individuals has two amounts listed – $20,208 and $161,351 – without any explanation.

8

The fourth page of R. Tab 30, not referenced in the Department's March 24, 2015 audit letter, consists of a list entitled "Former Rep Payee Clients who have spent bed nights at Oxford Street Shelter from March 2013 to the present" with handwritten annotations that appear to list the number of nights for each person each and showing a total – at $24 per night – of $435,072. There is no indication when the memorandum was prepared or whether the individuals listed had stayed at the Shelter during the mid-June 2014 to February 2015 time period for which reimbursement was denied.

Finally, R. Tab 30 contains two memoranda sent by City employees in October 2013. R. Tab 30, pp. 2-3.[8] Those memoranda are not mentioned in the March 24, 2015 audit findings but are relied upon by DHHS in support of its position on this appeal. Those memoranda indicate that the City was aware that persons for whom City employees were the representative payees were staying at the Oxford Street shelter and that those people received "substantial monthly social security income." R. Tab 30 p. 2. The memoranda propose charging a $5 per night user fee to be paid from the representative payee accounts, with the proceeds to be used to pay for some of the expenses of the Shelter.

The March 24, 2015 final audit sent to the City listed specific remedial action that DHHS required and notified the City that it had to file a plan of correction within 30 days. R. Tab 12 at 11-13.

However, even before the final audit findings dated March 24, 2015 were sent, the City had informed DHHS that on all the issues except item (5) – reimbursement for non-citizens – it was prepared to adhere to what it described as DHHS's new interpretation of the statute and

---

[8] The first memorandum is undated but references an Oxford Street Shelter client list for October 15, 2013. The second is dated October 24, 2013.

9

regulations.[9] Responding on March 16, 2015 to the preliminary audit findings, the City had reiterated that it had been using the same presumptive eligibility practices in past years and that those had been approved in past audits. It also reiterated that DHHS had previously approved reimbursement for shelter operating costs. However, the City stated that it was prepared to change its practices to address DHHS's objections. R.Tab 11.

However, after the preliminary audit findings had been sent but before the City had responded to those preliminary audit findings, DHHS had already issued a letter dated March 13, 2015 denying reimbursement for all of the Temporary Housing costs for which the City had sought reimbursement for the period from June 14, 2014 through October 31, 2014 – a total of $562,612.21. R. Tab 10.[10] That letter stated that the City had requested reimbursement for individuals and costs "that the City has not been able to demonstrate are eligible for General Assistance reimbursement." It added that the information provided by the City "does not support a finding that the City has made required eligibility determinations . . . a finding that the recipients of those benefits were in fact eligible . . . or a finding of any amount of reimbursement that DHHS is authorized to pay for those benefits."

The March 13 letter did not offer the City any opportunity to respond or to contest the DHHS determination and was silent as to any appeal rights that the City may have had.

---

[9] The issue involving non-citizens was separately litigated before this court in *Maine Municipal Association v. Maine DHHS,* AP-14-39 (Superior Court Cumberland), resulting in orders filed June 9, 2015 and August 19, 2015.

[10] The City's reimbursement requests for the period from June 17 to October 31, 2014 are contained in the record at R. Tab 29. Payments for persons at the shelter and shelter costs are listed under "Temporary Housing." Pursuant to 22 M.R.S. § 4311(1) and (1-B) the City had sought reimbursement at 90 percent for the second half of June, at 50 percent for the months of July through September, for part of October at 50 percent and for part of October at 90 percent. The amount withheld was more than one-third of the City's total General Assistance reimbursement request for the months in question.

10

On April 3, 2015 the City responded to the Department's March 13 letter, requesting reconsideration and in the alternative a fair hearing within 30 days pursuant to 22 M.R.S. § 4323(4). R. Tab 13. Specifically, the City objected that DHHS did not have the right to withhold reimbursement without following the procedures in 22 M.R.S. § 4323 and 10-144 C.M.R. ch. 323, section X. The City also argued that it had been acting in good faith in following the presumed eligibility procedure that had been in effect for some 20 years.

On April 13, 2015 the City submitted a plan of correction as directed in the Department's March 24 audit letter and requested a meeting with Commissioner Mayhew. R. Tab 14. On May 5, 2016 DHHS responded, requesting minor changes in the plan of correction (R. Tab 15), and the City submitted a revised plan incorporating the DHHS requests on May 7, 2016 and again requesting a meeting. R. Tab 16.[11]

Portland's request for a hearing on the Department's March 13 denial of reimbursement for Temporary Housing in June through October 2014 was still pending, and on May 11, 2015 DHHS prepared a "Fair Hearing Report Form". R. Tab 17. This form is the means by which a party's request for a hearing is transmitted to the Office of Administrative Hearings under DHHS regulations. *See* 10-344 C.M.R. ch. 1 § VI(B)(3).

On May 12, 2015 DHHS issued a letter denying reimbursement for all of the Temporary Housing costs for which the City had sought reimbursement for November and December of 2014 and for January and February of 2015 – a total of $734,548.29. R. Tab 18.[12] The May 12 letter reiterated the same language with respect to eligibility as the March 13 letter (R. Tab 10).

---

[11] The record does not reflect whether the requested meeting was ever held.

[12] The City's reimbursement requests for the period for November 2014 through February 2015 are contained in the record at R. Tab 28. Payments for persons at the shelter and shelter costs are listed under "Temporary Housing." Pursuant to 22 M.R.S. § 4311(1) the City had sought reimbursement at 90 percent. The amount withheld by DHHS was almost 40 percent of the City's total General Assistance reimbursement request for the months in question.

Once again, the May 12 letter did not offer the City any opportunity to respond or to contest the DHHS determination and was silent as to any appeal rights that the City may have had.

The City responded to the Department's May 12 letter that same day, requesting reconsideration and in the alternative a fair hearing within 30 days pursuant to 22 M.R.S. § 4323(4). R. Tab 19. In its response, the City reiterated the same points it had made in responding to the Department's March 13 letter.

On May 14 DHHS prepared a second Fair Hearing Report form. R. Tab 20. This was virtually identical to the first Fair Hearing Report form except that DHHS now took the position that there was no right to an administrative hearing and that the Department's denial of reimbursement was final agency action subject to judicial review.

The Chief Administrative Hearing Officer consolidated the two appeals. R. Tab 21. After both sides presented their positions as to whether a hearing was required, *see* R. Tabs 22 and 23, the Chief Administrative Hearing Officer expressed the view that the City probably had a right to an administrative hearing but suggested that the parties could agree to bypass an administrative hearing and proceed directly to an 80C appeal. R. Tab 24. The parties agreed to that suggestion. In fact, the City had already filed this action as a protective measure once it became aware of the Department's change of position as to the availability of an administrative hearing.


Issues with respect to the Record

As set forth in its brief, the basis for the Department's denial of reimbursement in its March 13 and May 12 letters is the information set forth in the documents in R. Tab 30. The City agreed at the August 1, 2016 hearing that the second and third pages of R. Tab 30 were memoranda exchanged between City officials. R. Tab 30 also included lists of certain shelter

12

residents with handwritten annotations of their alleged account balances. Some of those are referenced as examples of ineligibility in the Department's March 24, 2015 final audit letter (R. Tab 12 at 10-11). However, the source of the handwritten account balance information is unclear. In the City's brief and at the August 1, 2016 hearing, counsel for the City questioned whether the account balance information came from the City or from information in DHHS files. The record does not resolve this issue.[13]

The documents also contain calculations of the supposed cost of temporary housing at the shelter – or perhaps the amount for which reimbursement had been sought – at $24 per night. However, at the August 1, 2016 hearing counsel for both parties indicated that they did not know where the $24 figure originated.

For purposes of this order, the court will assume that the documents and information in R. Tab 30 either originated with the City or could have been obtained by the City from information in its own files. However, as set forth below, the absence of any opportunity for the City to challenge that assumption supports the City's argument that an administrative hearing should have been provided pursuant to 22 M.R.S. § 2243(4).

Statutory Interpretation

The City maintains that the program changes that DHHS directed Portland to make in its March 24, 2015 audit (R. Tab 12 at 11-13) represented significant changes from procedures that DHHS had previously approved. However, it is not challenging those program changes in this

---

[13] At the August 1, 2016 hearing counsel for DHHS stated that DHHS had not known there was a dispute as to the source of the information in R. Tab 30. Counsel for the City stated that it had agreed that R. Tab 30 should be part of the record because it was the basis for the Department's action but it had not agreed as to the source of the handwritten information.

action. As directed by DHHS, the City has stated that it will change its procedures and has filed a plan of correction that is satisfactory to DHHS. R. Tabs 11, 14-16.

The City contends, however, that DHHS cannot withhold reimbursement except pursuant to the terms of 22 M.R.S. § 4323 and 10-144 C.M.R. ch. 323, section X. Accordingly, it seeks to set aside the denial of reimbursement for mid-June 2014 through February 2015. The City argues that § 4323 and the accompanying rule set out a detailed procedure whereby DHHS can require a municipality to remedy what DHHS perceives as any violation of the General Assistance statute and Rules – a procedure which provides for both an opportunity for the municipality to submit a plan of correction, a procedure which provides for an administrative hearing, and a procedure which permits withholding of reimbursement only if a plan of correction is not submitted or is not followed. In this case, Portland has submitted a corrective plan and has revised that plan to incorporate minor revisions suggested by DHHS. There is no evidence that Portland is not following the plan of correction. Accordingly, the City argues, DHHS cannot withhold reimbursement.

DHHS initially responds with an expression of outrage that the City was presuming the eligibility of certain individuals who it knew possessed substantial assets in their representative payee accounts. Second, DHHS contends that although it is entitled to proceed under 22 M.R.S. § 4323 to seek correction of any violations of chapter 1161, it has an independent right to withhold reimbursement pursuant to 22 M.R.S. § 4311(1) based on the language in that section that the Department shall reimburse a municipality "when the Department finds that the municipality has been in compliance with all requirements in this chapter."

This raises an issue of statutory interpretation. In interpreting statutes, the court examines "the plain meaning of the statutory language seeking to give effect to the legislative intent, and

14

we construe the statutory language to avoid absurd, illogical, or inconsistent results." *Beaudry v. Harding*, 2014 ME 126 ¶ 6, 104 A.3d 134, *quoting Central Maine Power Co. v. Devereux Machine Inc.*, 2013 ME 37 ¶ 8, 68 A.3d 1262.

> We construe the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the legislature, may be achieved. Furthermore, it is a fundamental principle of statutory construction that a statute dealing with a subject specifically prevails over another statute dealing with the same subject generally.

*Beaudry,* 2014 ME 126 ¶ 6. In construing a statute, the court may properly consider its practical operation and potential consequences. *E.g., Doe v. RSU 26,* 2014 ME 11 ¶¶ 14-15, 86 A.3d 600.

Interpreting § 4311(1) as an independent source of authority for DHHS to withhold reimbursement allows DHHS to circumvent the procedure mandated by § 4323, to deprive the City of its right to an administrative hearing pursuant to § 4323(4), and to ignore statutory language in § 4323(2) that reimbursement shall be withheld when a municipality has been given notice of a violation and fails to submit an appropriate plan of correction or fails to adhere to the plan of correction once submitted. Thus, accepting DHHS's interpretation of § 4311(1) in this case would make § 4323 either superfluous or optional.

DHHS, however, argues that interpreting chapter 1161 to allow it to disallow reimbursement under § 4311(1) does not negate § 4323 because § 4311(1) and § 4323 serve different purposes:

> The statutory and regulatory framework . . . provides the State with, in effect, both an "offensive" and "defensive" mechanism for dealing with inappropriate claims for GA reimbursement. The two are conceptually distinct, operate separately, may be applied in different (or, occasionally, the same) circumstances, derive from explicitly distinct provisions, and are equally necessary to prevent abuse of the system. In the present case, the City wishes to effectively disarm the State by negating in its entirety the 'defensive' weapon in the State's arsenal, codified in § 4311.

15

In a nutshell, § 4311 lays out the simplest of standards, starting in Subsection (1) that the State "shall reimburse the municipality . . . *when it finds that the municipality has been in compliance with all requirements* of this chapter." This is the Department's "defensive" weapon: ineligible expenditures (and only ineligible expenditures) submitted for reimbursement will not be reimbursed.

Brief of Respondents at 6-7 (footnote omitted; emphasis as it appears in DHHS brief).

DHHS emphasizes that this "defensive weapon" is summary in nature, includes no right to a hearing, and does not provide any procedural mechanism other than Rule 80C review by which a municipality can contest the Department's decision:

No prior notice is required. No formal review is required. No discussion with the municipality is mandated. No written notice of violation is required. No opportunity to 'correct' the violation is possible. There is no 'plan' that may be submitted to miraculously change the unreimbursable cost into a reimbursable one. On the other hand, no penalties beyond rejection of the submitted request are permissible.

Brief of Respondents at 7.

Section 4323, according to DHHS, is more complex "offensive weapon" under which DHHS can invoke "more substantial remedies," including the submission of a plan of correction and the withholding of all general assistance reimbursement if a satisfactory plan of correction is not submitted or is not followed. Brief of Respondents at 7-8.

There are a number of significant problems with the Department's interpretation. First, there is no language in § 4323 or elsewhere in chapter 1161 that makes the procedure in § 4323 optional or that supports DHHS's contention that sections 4311(1) and 4323 are intended to give DHHS offensive and defensive "weapons." Contrary to the Department's interpretation, § 4311(1) does not convey separate authority to disallow reimbursement for ineligible expenditures. If the legislature had intended to authorize the disallowance of reimbursement

16

under that provision, it could have included express language to that effect. Under the principle that the specific controls the general, the specific procedural requirements in § 4323 must be read in harmony with the general language in § 4311(1), leading to the conclusion that the procedure by which DHHS shall determine whether or not a municipality "has been in compliance with all the requirements of this chapter," 22 M.R.S. § 4311(1), is the procedure set forth in § 4323.[14]

Second, DHHS regulations unequivocally provide that "withholding of reimbursement as a result of a review shall not take place" unless a satisfactory plan of correction has not been submitted or is not being followed. 10-344 ch. 323 Section XII page 1 (emphasis added). It is a fundamental principle of administrative law that agencies are required to follow their own rules. *FCC v. Fox TV Stations Inc.*, 556 U.S. 502, 549 (2009). *Accord, United States v. Nixon*, 418 U.S. 683, 695-96 (1974); *United States ex rel. Accardi v. Shaughnessey,* 347 U.S. 260, 267 (1954).

Third, while DHHS acknowledges – and indeed practically boasts – that its interpretation of § 4311(1) provides a summary procedure without notice or an opportunity for a municipality to contest the denial of reimbursement at an administrative hearing, *see* Brief for Respondents at 7 (quoted above at 16), this is both illogical and impractical. DHHS acknowledges that the City has a right to contest DHHS's denial of reimbursement by seeking judicial review. However, under DHHS's interpretation the City has no right to be heard at the administrative level, with the result that there is no administrative record except for the one-sided justification proffered by

---

[14] DHHS seems to suggest that § 4323 contemplates the withholding of *all* reimbursement if a violation is found and a plan of correction is either not submitted or is not followed. It then suggests that its interpretation of § 4311(1) allows for a more limited denial of reimbursement tailored to the specific violation. However, there is nothing in § 4323 that requires DHHS to withhold all reimbursement if a violation is not corrected. That section authorizes partial or full withholding. The DHHS regulations recognize this distinction. For program violations, the regulations specify that reimbursement may be withheld without specifying the amount to be withheld. *See* 10-344 C.M.R. ch. 323 § XII page 1. In contrast, where a municipal *ordinance* is found to be in violation of the GA statute, the regulations expressly provide that DHHS may withhold "all" reimbursement to the municipality. 10-344 C.M.R. ch. 323 § XII page 3.

DHHS. This violates the basic principles applicable to judicial review of administrative action. In reviewing a summary denial of reimbursement under the Department's interpretation of § 4311(1), the court would either have to review the record without considering any countervailing evidence that the City could provide – in apparent contravention of due process – or it would have to allow the City to offer evidence during the Rule 80C proceeding – which would lead to a trial de novo rather than Rule 80C review.[15]

By way of example, the record does not establish whether or not the City knew the account balances of representative payees who stayed at the shelter (shown in handwriting on the lists in R. Tab 30) or could have obtained that information from its files. For purposes of this ruling, the court is prepared to make those assumptions. However, the City has questioned whether its employees actually had access to the account balances information, and that issue could have been resolved at an administrative hearing.

Finally, the action taken by DHHS in this case – the denial of all reimbursement for Temporary Housing for the period from mid-June 2014 through February 2015 – is not consistent with DHHS's stated interpretation that § 4311(1) allows it to deny reimbursement for "ineligible expenditures (and only the ineligible expenditures)." *See* Brief for Respondents at 7. This is true for following reasons:

(1) The list of the "Top 30 Stayers,"[16] 13 of whom appear to have had substantial assets based on payments from Social Security, is dated November 13, 2013. There is nothing in the

---

[15] The City argues that much of information on which DHHS relied did not relate to the June 2014-February 2015 period for which reimbursement was denied and that many of the individuals deemed ineligible by DHHS would have been at least partially eligible. As discussed below, the Department's denial of reimbursement greatly exceeded any amount that can be supported on the record before the court.

[16] R. Tab 30, page 5.

record to support a finding that the 13 individuals stayed at the Oxford Street Shelter during the period from mid-June 2014 through February 2015 – the period for which reimbursement was denied – and the City argues that at least some of those individuals did not stay at the shelter during the relevant time period.

(2) The list of "Rep Payee Clients" who stayed at the Oxford Street Shelter in 2014[17] also does not reveal which of those clients stayed at the shelter during the specific period from mid-June 2014 through December 2014.

(3) Moreover, even assuming that all of the representative payee clients listed on pages 6-7 of R. Tab 30 stayed at the shelter during the second half of 2014, 33 of the 59 individuals had either no assets, minimal assets, or assets that were less than cost of housing them at the shelter using the $24 per night figure set forth on the list.[18] As a result, even if the City had reclaimed all of the assets of those individuals to pay for their shelter costs, the City would have been eligible for GA reimbursement for those individuals once their assets had been exhausted.

(4) Most significantly, the available assets shown for all the representative payees who stayed at the shelter in 2014, based on the list at Pages 6-7 of R. Tab 30, totals $197,629.06. Assuming that the City wrongfully sought reimbursement for that entire amount would, under the Department's argument, have justified denial of $ 197,629.06 in reimbursement. DHHS instead withheld reimbursement totaling $1,297,120.50 – $562,612.21 for the period from mid-June through October 2014 and $734,548.29 for the period from November 2014 through February 2015. This represented all of the GA reimbursement sought by the City for Temporary Housing for those periods.

---

[17] R. Tab 30, pages 6-7.

[18] In this connection, although the Department's March 24, 2015 audit states that "many" of the individuals on the list had combined assets amounting to "as much as $50,000" (R. Tab. 12 at 11), only one individual on the list is actually listed as having assets of $50,000 or more. See p. 8 above.

On this record, therefore, it is apparent that DHHS did not deny reimbursement "for ineligible expenditures (and only ineligible expenditures)" as it claims but in fact denied reimbursement as a sanction for what it found to be Portland's misuse of presumed eligibility with respect to residents of the Oxford Shelter. While the Department's unhappiness with Portland's presumed eligibility policy is understandable, denial of reimbursement as a sanction for alleged program violations can only be accomplished through the procedures set forth in 22 M.R.S. § 4323 and 10-344 ch. 323 Section XII.

In sum, even if the Department's interpretation of § 4311(1) were accepted, the record would support a finding that the City sought reimbursement for some ineligible individuals who had significant assets, but the actual amount of ineligible expenditures cannot be determined. There is no substantial evidence in the record that supports the Department's denial of $1,297,120.50 in reimbursement.

In any event, the court does not accept the Department's interpretation of § 4311(1). For the reasons stated above, it concludes that the specific procedures set forth in 22 M.R.S. § 4323 and 10-344 ch. 323 Section XII are applicable to DHHS review of a municipality's administration of the general assistance program and any withholding of reimbursement. Thus, while 22 M.R.S. § 4311(1) states that reimbursement shall be made "when the department finds that the municipality has been in compliance with [the requirements of chapter 1161]," any finding to the contrary must be made pursuant to the procedures specified in § 4323.

On this issue, the Department's interpretation of the relevant statutory provisions is not entitled to deference for three reasons. First, the Department's interpretation is not supported by the statutory language and is contrary to the legislative intent as expressed in the statutory scheme as a whole. Second, as demonstrated by the Department's about-face on whether the City

20

was entitled to an administrative hearing pursuant to 22 M.R.S. § 4323(4), the Department's interpretation has been inconsistent at best and appears to be nothing more than a post-hoc rationalization. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).[19] Third, the interpretation proffered by DHHS is directly inconsistent with its own regulations, which specify that "withholding of reimbursement as a result of a review shall not take place" unless a satisfactory plan of correction has not been submitted or is not being followed. 10-344 C.M.R. ch. 323 § XII page 1.

The Department's Remedy for Knowingly Ineligible Expenditures

The foregoing discussion is not to suggest that the court has any sympathy for the City, which appears to have ignored assets – in some cases, very substantial assets – available to a number of the individuals staying at the shelter.

The City did this in reliance on a presumed eligibility policy. There is statutory authorization for the presumed eligibility of individuals served by homeless shelters in the final sentence of 22 M.R.S. § 4304(3) ("Municipalities may arrange with emergency shelters for the homeless to presume eligible for municipal assistance persons to whom the emergency shelter provides shelter services"). Moreover, the court does not doubt that certain persons with mental illness are homeless and therefore turn to the Shelter for housing even though they have been found eligible for social security disability payments that are sent to representative payees. However, eligibility cannot be presumed where a municipality is aware of assets that would make an individual ineligible.

[19] DHHS appears to have recognized that, if it agreed that the City was entitled to an administrative hearing under § 4323(4), it would be extraordinarily difficult for it to argue that the remaining provisions of § 4323 were inapplicable.

Although DHHS had acquiesced in the City's presumed eligibility policy, despite its misgivings,[20] until 2015, the record supports a finding that city officials knew that some individuals who were being presumed eligible in fact had "substantial monthly social security income." R. Tab 30, page 2. Under those circumstances, the City's failure to consider that income for purposes of eligibility and, where appropriate, to seek reimbursement from that income is unjustifiable.[21]

The thrust of the argument raised by DHHS in this case goes to the question of whether, given the procedure set forth in § 4323 – requiring a notice of violation, an opportunity for the municipality to submit a plan of correction, and the imposition of penalties only if the municipality fails to submit an acceptable plan or fails to comply with that plan once submitted – DHHS is nevertheless required to provide reimbursement for ineligible expenditures knowingly made by a municipality. DHHS argues that the legislature simply cannot have intended to require the State to reimburse municipalities for knowingly ineligible expenditures, with the State's sole remedy to require a plan of correction.

By way of example, DHHS argues that if a municipality were to spend general assistance funds to buy police cruisers, it would defy common sense to conclude that DHHS would have to reimburse the municipality for those cruisers with no other recourse other than to insist on a plan of correction to prevent GA spending on police cruisers in the future. The court does not disagree. However, contrary to the Department's argument, the Department would have an existing remedy without circumventing the procedures set forth in § 4323.

---

[20] See R. Tab 1 (June 17, 1996 letter); R. Tab 9 (draft letter of April 9, 2014 – never sent).

[21] This is particularly true because the statute and regulations required that, at a minimum, verification of eligibility for emergency benefits be completed within 30 days. *See* 22 M.R.S. § 4310(4); 10-344 C.M.R. ch. 323 § IV page 6.

In the court's view, there is nothing in § 4323 that would prevent DHHS from requiring a municipality – as part of its plan of correction under § 4323(2) – to forego reimbursement for knowingly ineligible expenditures.[22] Under § 4323 if DHHS finds that a municipality's policies, practices, or procedures violate the requirements of chapter 1161, it shall notify the municipality of the violation and specify the actions necessary to correct the violation. If a municipality submits an acceptable plan of correction and thereafter complies with chapter 1161, no penalties – including withholding of reimbursement – can be imposed. But where violations include knowingly ineligible expenditures, including the Department's hypothetical example involving the purchase of police cruisers, DHHS could require that the plan of correction include an offset from future reimbursement for knowingly ineligible expenditures.

Applying that to the facts in this case, in its March 24, 2015 audit findings DHHS directed that Portland limit presumed eligibility to one night, that the City thereafter obtain a completed application within 30 days, and that reimbursement would available only for the initial night if the individual were found to be ineligible. R. Tab 12 at pages 11-12 ¶¶ 1-2. DHHS also directed that reimbursement would not be provided for the cost of operating the shelter including rent, electricity, heating, and personnel expenses. R. Tab 12 at page 12 ¶ 4(b). Both of these directives represented changes in policy. Despite its prior objections, DHHS had previously acquiesced in Portland's presumed eligibility policy for individuals staying at the

---

[22] Within the category of knowingly ineligible expenditures, the court would include expenditures for persons who the City either knew were ineligible or those who the City had reason to know were likely to be ineligible (i.e., those who had City employees as representative payees) and whose eligibility or ineligibility could have been ascertained from information in the City's own records.

Oxford Street Shelter.[23] Moreover, the Department had previously agreed (R. Tab 1) that the costs of operating the shelter would be considered as eligible for reimbursement.

Because those directives represented a change in policy, they were properly made prospective. Portland thereafter submitted a plan of correction that was acceptable to DHHS, thereby precluding the imposition of penalties under § 4323(2).

If DHHS had identified specific expenditures that, pursuant to the City's presumed eligibility policy, were incurred on behalf of individuals known to be ineligible, it could have required the City to forego reimbursement for those individuals as part of its plan of correction. That would have allowed the City to obtain an administrative hearing to contest the Department's eligibility decisions, the amounts disallowed for ineligible individuals, and whether the ineligible expenditures fell within the applicable time periods. Instead, the Department improperly circumvented the procedures specified in § 4323 and sought to impose a sweeping disqualification of all of the Temporary Housing costs submitted by the City from mid-June 2014 through February 2015, including the costs incurred for eligible individuals.

The court therefore does not accept the Department's argument that the procedure specified by the legislature in § 4323, which specifies the parameters under which DHHS shall "share responsibility with municipalities for the proper administration of general assistance," leaves it without a remedy to avoid reimbursement for knowingly ineligible expenditures. For that reason, and for the reasons previously stated, the court concludes that the Department's summary denial of reimbursement was in violation of 22 M.R.S. § 4323, was in excess of the

---

[23] Based on the facts in the record, the Department's objections were warranted. Moreover, the Department had objected to the City's presumed eligibility policy in its 2014 audit findings. R. Tab 8. The record does not explain why the Department thereafter drafted – but did not send – an April 24, 2014 letter requiring a change in the presumed eligibility policy. R. Tab 9.

agency's statutory authority, and was made upon unlawful procedure. 5 M.R.S. § 11007(4)(C)(1)-(3).

Department's Motion to Dismiss Counts II and III

The remaining issue before the court involves the Department's motion to dismiss the City's claim for declaratory and injunctive relief and its promissory estoppel claim.

The court agrees that the promissory estoppel claim should be dismissed. To the extent that the City is contending that DHHS should be estopped from denying restitution from June 2014 through February 2015 because of its prior acquiescence in the City's presumptive eligibility policy and its prior approval of shelter operating costs, that claim need not be reached in light of the ruling on the Rule 80C appeal. The City is not arguing that DHHS cannot prospectively change its position.

With respect to the City's claim for declaratory and injunctive relief, the parties agreed at the August 1, 2016 hearing that there are some additional time periods for which reimbursement is in question and which raise the same issues litigated in this action. For that reason the court will issue declaratory relief consistent with its ruling above. However, the court sees no need for injunctive relief. The Department has a right to appeal, but if no appeal is taken or this order is upheld on appeal, the proceedings before the court have not demonstrated any unwillingness on the Department's part to accept a judicial determination in the form of declaratory relief. *See Littlefield v. Town of Lyman*, 447 A.2d 1231, 1235 (Me. 1982).

The entry shall be:

1. The decision by the Department of Health and Human Services to withhold general assistance reimbursement of $ 562,612.21 for mid-June 2014 through October 2014 and $ 734,548.29 for November 2014 through February 2015 is reversed.

2. Declaratory relief shall be entered on Count II of the complaint that DHHS is not authorized to withhold General Assistance reimbursement to the City of Portland based on alleged ineligibility or on alleged violations of chapter 1161 without following the procedures set forth in 22 M.R.S. § 4323 and without affording a hearing under 22 M.R.S. § 4323(4). The City's request for injunctive relief is denied.

3. Count III of the City's complaint is dismissed. Accordingly, this constitutes a final judgment.

4. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: August **3**, 2016

Thomas D. Warren
Justice, Superior Court

26